# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     . CRIMINAL NO. 12-10119-NMG
                              .

         V.                 . BOSTON, MASSACHUSETTS
                              . JUNE 12, 2012

ORLANDO VALLE                   .
     Defendant             .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
**(TESTIMONY OF WITNESS ONLY)**
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

     APPEARANCES:

     For the government:    UNITED STATES ATTORNEY'S OFFICE
                              BY: Christopher Pohl, Esq.
                              One Courthouse Way, Suite 9200
                              Boston, MA  02210
                              617-748-3100

     For the defendant:     Bernard Grossberg, Esq.
                              15 Broad Street
                              Suite 240
                              Boston, MA 02109
                              617 737-8558
                              bgrossberg@grossberglaw.com

     Court Reporter:

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                              **I N D E X**

2       **WITNESSES**      **DIRECT**      **CROSS**      **REDIRECT**      **RECROSS**

3

4       **Government's:**

5       James Mar          3              35             51

6       **EXHIBITS**                 **DESCRIPTION**                      **IN**

7       **EVIDENCE**

8       **Government's:**

9            1                       Reports                          15

10           2                       Photos                           16

11           3                       Search Warrant and Return        26

12           4                       Document                         31

13           5                       Photograph                       34

14

15

16

17

18

19

20

21

22

23

24

25

3

1          GOVERNMENT WITNESS, JAMES MAR, sworn

2               MR. POHL:  May I inquire, Your Honor?

3               THE COURT:  Yes.

4               MR. POHL:  Pull that microphone up nice and close

5    to you please.

6                         DIRECT EXAMINATION

7    BY MR. POHL:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   Can you introduce yourself to the Court and spell your

11   last name for the record?

12   A.   Yes, James Mar, M-A-R.

13   Q.   Where do you work?

14   A.   I'm an ATF agent.

15   Q.   How long have you worked for ATF?

16   A.   Since September of 2004.

17   Q.   All right.  And is there a particular part of

18   Massachusetts where you presently work?

19   A.   Yes, my group is assigned to the northeastern part of

20   Massachusetts.

21   Q.   And that would include the city of Lawrence,

22   Massachusetts?

23   A.   That's correct.

24   Q.   All right.  Are you familiar with the defendant

25   Orlando Valle?

4

1   A.    Yes.

2   Q.    All right.  When was the first time, Special Agent

3   Mar, that you became familiar with the name Orlando Valle?

4   A.    In 2007.

5   Q.    And what, how did you become, how did you learn about

6   the name Orlando Valle at that time?

7   A.    He came up in a case in which an individual who is a

8   straw purchasing several guns in New Hampshire gave a

9   statement to an agent out of New Hampshire that he sold

10  approximately 15 of those guns to Mr. Valle.

11          MR. GROSSBERG:  Your Honor, if I may I've been

12  provided with reports regarding these alleged transactions

13  2007.  I'm objecting to that because in order to

14  effectively cross exam on that particular series of

15  incidents, I would ask who the informant was, and if the

16  government's not going to disclose who the informant was

17  involved in that series of transactions I would argue to

18  Your Honor that all of that is inadmissible.

19          MR. POHL:  Well first of all, I think it's

20  admissible to show why the agent would be familiar with Mr.

21  Valle and the events that took place late in 2011.  Second

22  of all, I don't think there'd be a requirement for the

23  government to disclose an informant ever and a cooperating

24  witness which is what I think a few questions would

25  establish that we would not at this time be required to

5

1  disclose a CW particularly in a case which I don't think

2  resulted in any charges.  This is essentially information

3  that the officer received through another investigation

4  about Orlando Valle.

5          THE COURT:  I'll overrule the objection for now.

6          MR. GROSSBERG:  All right.

7          MR. POHL:  Thank you.

8  BY MR. POHL:

9  Q.   All right, Special Agent Mar, let me just ask you one

10 or two questions about your last answer.  So you had an

11 investigation back in 2007, correct?

12 A.   That's correct.

13 Q.   And there was an investigation into a straw purchase

14 for someone who was buying guns out of Massachusetts,

15 correct?

16 A.   Yes, the New Hampshire office said that.

17 Q.   Okay.  And where was the, the target of that

18 investigation in 2007 lived where?

19 A.    In Lawrence.

20 Q.   Okay.  And so in the course of that investigation did

21 you and other ATF agents arrest the, let's call him a straw

22 purchaser?

23 A.    Yes, the ATF agent from New Hampshire and the

24 Massachusetts state police arrested him.

25 Q.   All right.  And--

6

1          THE COURT:  This is the same straw buyer we're

2  still talking about?

3          MR. POHL:  Correct, right.

4  BY MR. POHL:

5  Q.   And so the straw buyer was arrested with a – well tell

6  me about the arrest of the straw buyer?  What was he

7  arrested with?

8  A.   A handgun that he had purchased in a New Hampshire

9  store and drove over the state line.

10  Q.   Okay.  So the straw purchase goes up to New Hampshire,

11  buys a gun and comes back to Massachusetts, when he gets

12  back to Massachusetts he's arrested?

13  A.   That's correct.

14  Q.   All right.  And after that person's arrested what

15  happens?

16  A.   He's basically Mirandized by the agent and a trooper

17  and they interview him and during that interview--

18  Q.   Well let me, all right, let me stop you there.  During

19  that interview did ATF tell this individual that

20  essentially they knew what he was doing?

21  A.   Yes.

22  Q.   All right.  And that they had seen paperwork

23  concerning other gun purchases that he made in New

24  Hampshire?

25  A.   That's correct.

7

1  Q.   All right.  And then what did this person disclose to

2  the agents?

3  A.   He disclosed that he was purchasing firearms and

4  selling them for profit.

5  Q.   And did he disclose, I think you mentioned this

6  earlier, but he disclosed at least one of the purchasers of

7  several of the firearms?

8  A.   Correct.

9  Q.   And who was that?

10  A.   Orlando Valle.

11  Q.   And how many purchased guns did this individual

12  indicate was provided to Orlando Valle?

13  A.   There was approximately 15 handguns.

14  Q.   Now did you take steps to, with this – well did this

15  individual agree to continue to cooperate with the

16  government?

17  A.   Yes.

18  Q.   All right.  In the course of those actions what did

19  you ask the cooperating witness to do?

20  A.   Well we wanted to try and recover some of the guns

21  that he had been bringing down to Massachusetts.

22  Q.   Okay.  And did you attempt to get back some of those

23  guns from Orlando Valle?

24  A.   Yes, we did.

25  Q.   All right.  Was the cooperating witness ever able to

8

1    do that?

2    A.    No.

3    Q.    Okay.  All right, so it's fair to say that's the first

4    time that you, the name of Orlando Valle came up to you as

5    an ATF agent?

6    A.    That's correct.

7    Q.    All right.  Let's jump ahead to November of 2011.  Did

8    you become aware--

9            THE COURT:  I'm sorry, what month?

10           MR. POHL:  November of 2011, Your Honor.

11           THE COURT:  November.  Thank you.

12           MR. POHL:  Thank you.

13   BY MR. POHL:

14   Q.    Did you become aware of a, an arrest warrant that had

15   issued for Orlando Valle?

16   A.    Yes.

17   Q.    Okay.  Have you – what was the arrest warrant for?

18   A.    Assault and battery, assault and battery with a

19   dangerous weapon.

20   Q.    Okay.  Now were you involved in any way in the case

21   which resulted in the issuance of the warrant?

22   A.    No, I was not.

23   Q.    All right.  Have you reviewed any police reports

24   concerning that incident?

25   A.    Yes.

1   Q.   Okay.  And have spoken to any of the officers from

2   the Lawrence police department who are at least generally

3   familiar with the incident involving Orlando Valle?

4   A.   Yes.

5   Q.   All right.  And based on those conversations and based

6   on your review of the report, you know, can you tell the

7   Court essentially why a warrant issued for Mr. Valle's

8   arrest?

9   A.   Yes.  Officer Cirillo (ph) was called to Dunkin'

10  Donuts on Hanover Street and when he got there he met with

11  Chelsea Keene.  She in fact told him that she was assaulted

12  a couple days earlier.  She explained that she had a

13  conflict with a car that she sold Mr. Valle and between a

14  couple heated phone calls between Mr. Valle and his

15  girlfriend who she identified as Elizabeth they, when she

16  got out of work Mr. Valle and the girlfriend identified as

17  Elizabeth showed up and confronted this girl and she told

18  Officer Cirillo that basically she was head butted in the

19  cheek and then punched by Mr. Valle and then Elizabeth had

20  grabbed her from the hair and also was punching her.  So

21  she fell to the ground and then she was kicked and stomped

22  repeatedly until the, that ended and then they left the

23  area.

24  Q.   Okay.  Now you mentioned this in your testimony a

25  moment ago, she didn't report this incident right away,

1   correct?

2   A.   That's correct.

3   Q.   It's a couple days later?

4   A.   Correct.

5   Q.   Did she tell the officer who responded from the

6   Lawrence police department why she waited a couple days to

7   report the incident?

8   A.   Yes.

9   Q.   And why, why was that?

10  A.   She said she was urged by the management of Dunkin'

11  Donuts to do that and that also she was in fear of Mr.

12  Valle.

13  Q.   Okay.

14  A.   Because he, he and his friends are violent people I

15  believe is what she said.

16  Q.   Okay.  And the officer speaks to her.  It's a couple

17  days after the assault.  You reviewed the report in this

18  case; is that correct?

19  A.   That's correct.

20  Q.   Did the officer make note of any observable physical

21  injuries that this woman had when the officer spoke to her?

22  A.   Yes, there was some bruising on her face and around

23  one of her eyes and one of her ears.

24  Q.   Okay.  Now based on this what does the Lawrence police

25  officer who responds to the Dunkin' Donuts do?

11

1   A.   He went back and applied for a warrant or in his

2   investigation I think he identified two witnesses and the

3   victim of where Mr. Valle was living.

4   Q.   Okay.  And where was that?

5   A.   282 Farnham Street.

6   Q.   And that's in the city of Lawrence?

7            THE COURT:  282 what street?

8            THE WITNESS:  Farnham.

9            THE COURT:  Farnham.

10  BY MR. POHL:

11  Q.   All right, now when Officer Cirillo takes this report,

12  conversation with the victim he finds out that he thinks

13  Mr. Valle's living at 282 Farnham Street; is that correct?

14  A.   That's correct.

15  Q.   All right.  And he applies for an arrest warrant?

16  A.   Yes.

17  Q.   Is an arrest warrant issued?

18  A.   Yes.

19  Q.   All right.  And is that arrest warrant issued on

20  November 14, 2011 or thereabouts?

21  A.   Thereabouts, yes.

22  Q.   Okay.  And was there an address listed on the arrest

23  warrant?

24  A.   Yes, there was.

25  Q.   What was the address?

12

1  A.   282 Farnham Street.

2  Q.   Okay.  Now when – up to this point you hadn't had any

3  involvement in this case at all, correct?

4  A.   No.

5  Q.   Okay.  Let me jump ahead then to I guess maybe before,

6  maybe not the day of November 21, 2011 but maybe the day

7  before or day or two before.  Do you in the course of your

8  responsibilities as an ATF agent often work with other

9  local police departments?

10 A.   Yes.

11 Q.   All right.  And is one of the things that you do in

12 connection with ATF help them on warrant arrests?

13 A.   Yes.

14 Q.   All right.  And did you speak to any officers or state

15 police officers concerning the arrest of Orlando Valle?

16 A.   Yes.

17 Q.   All right.  Can you tell the Court about that

18 conversation?

19 A.   I spoke with Trooper Struzulo (ph) who informed me

20 that he had a warrant for Orlando Valle and they were going

21 to attempt to pick him up.

22 Q.   Okay.  And when, they were intending to pick him up on

23 November 21, 2011?

24 A.   That's correct.

25 Q.   Okay.  And does Trooper Struzulo work for a particular

13

1   unit in the Massachusetts state police?

2   A.   Yes.

3   Q.   What is that, VFAS, what does that stand for?

4   A.   Violent fugitive apprehension section.

5   Q.   Okay.  So with the arrest warrant did you and Trooper

6   Struzulo and other officers attempt to arrest Orlando Valle

7   on November 21, 2011?

8   A.   Yes.

9   Q.   All right.  Before I ask you about the circumstances

10  surrounding that arrest it's fair to say that there was,

11  Mr. Valle was arrested on November 21st; is that correct?

12  A.   That's correct.

13  Q.   And there were reports generated concerning the

14  arrest; is that correct?

15  A.   That's correct.

16  Q.   All right.  I'm going to turn your attention to my

17  right which would be your left.  Do you see that series of

18  reports in front of you?

19  A.   Yes.

20  Q.   Okay.  And as you thumb through it is it fair to say,

21  Special Agent Mar, that that is a, the report concerning

22  the assault at the Dunkin' Donuts and also the attempt to

23  arrest Mr. Valle at 282 Farnham Street?

24  A.   Yes.

25  Q.   All right.  And you didn't write any of those reports;

1   is that correct?

2   A.   No.

3   Q.   But with the exception of the Dunkin' Donuts incident

4   which you weren't present for you've reviewed them before

5   your testimony here today?

6   A.   Yes.

7   Q.   And you believe those reports to be accurate?

8   A.   Yes.

9            MR. POHL:  Your Honor, I'd ask that those reports

10  be introduced as Government's 1.

11           THE COURT:  Any objection?

12           MR. GROSSBERG:  Yes, Your Honor.

13           THE COURT:  What's the objection?

14           MR. GROSSBERG:  The objection is that they're

15  pure hearsay.

16       PAUSE

17           THE COURT:  Well I'll overrule the hearsay

18  objection with respect to the report regarding the

19  circumstances of the arrest.  The officer I think testified

20  that he was present for the arrest.  And I think that the,

21  if I'm understanding correctly you're not offering the

22  report regarding the Dunkin' Donuts for the truth of the

23  matter asserted.

24           MR. POHL:  I'm not, Your Honor.

25           THE COURT:  You're offering it for the fact that

15

1  this person said it.

2          MR. POHL:  This person said it and then explains

3  why the officer did what they did on November 21st.

4          THE COURT:  Right.  On that basis then I'll

5  overrule the objection as to that part of the report as

6  well and that will be Exhibit 1 in evidence.

7          GOVERNMENT EXHIBIT NO. 1, ADMITTED

8          MR. POHL:  Right.  Thank you very much.

9  BY MR. POHL:

10  Q.   All right, November 21, 2011 about 7:30 in the morning

11  where were you, what did you and the officers and agents

12  that you work with, where did you go?

13  A.   We went to 282 Farnham Street.

14  Q.   And tell the Court essentially what 282 Farnham Street

15  looks like?

16  A.   It's a three story multifamily house.

17  Q.   Okay.

18  A.   Two doors in front.

19  Q.   All right.  You know what, this is going to take it

20  out of sequence but I think it might make things easier,

21  just the stack of photographs in front of you, Special

22  Agent Mar, do you recognize those?

23  A.   Yes.

24  Q.   Okay.  And were those photographs at least in that

25  stack taken on November 21, 2011 at 282 Farnham Street?

16

1   A.   Yes.

2   Q.   All right.  And with some differences that we'll talk

3   about during your testimony, essentially the photographs

4   accurately captured the way the building looked on November

5   21, 2011?

6   A.   Yes.

7            MR. POHL:  All right.  Your Honor, I'd ask that

8   that stack photographs which have been provided to defense

9   counsel before today's hearing be introduced as Exhibit 2,

10  and I think it will help everyone to explain what happens

11  if you look at the pictures as we go through--

12           MR. GROSSBERG:  No objection as to the

13  photographs.

14           THE COURT:  All right, Exhibit 2 in evidence.

15       GOVERNMENT EXHIBIT NO. 2, ADMITTED

16  BY MR. POHL:

17  Q.   All right, Special Agent Mar, let's take a look at the

18  first photograph on the top of that page.  So orient the

19  Court, so this building is 282 Farnham Street and other

20  buildings?

21  A    Yes, two addresses there.

22  Q.   Okay.  And so is it fair to say that 282 Farnham

23  Street's the door on the right?

24  A.   That's correct.

25  Q.   Okay.  All right.  So and 282 Farnham Street where

1  does, when you go through that door where does it lead

2  you to?

3  A.   It leads you into an apartment.

4  Q.   On the first floor?

5  A.   Yes.

6  Q.   Okay.  All right, so let's turn ahead to the second

7  photograph.  Basically that door, 282 Farnham Street, was

8  it marked like that on the morning of November 21, 2011?

9  A.   Yes, that marking.

10  Q.   Okay.  Now I'm going to turn you to the third

11  photograph which is essentially a photograph of an open

12  door, okay.  And using those three photographs that we've

13  already talked about can you tell the Court how the door to

14  282 Farnham Street looked at 7:30 in the morning on

15  November 21, 2011 when you and the other agents went to

16  arrest Orlando Valle?

17  A.   Yes.  As we arrived Trooper Struzulo, myself, Trooper

18  Vandini (ph) went to the front door.

19  Q.   Okay, what did you do when you got to the front door?

20       A.     The front door was actually ajar.  The

21  screen door and the inside door was both ajar.

22  Q.   Okay.

23  A.   They were both open.

24  Q.   All right.  What'd you do when you essentially saw

25  the, so just so that I'm clear there's a screen door in

1  front?

2  A.   Yeah, it is.

3  Q.   Like a storm door.  Okay.  And then there's a heavier

4  door behind, right?  So the real door, the door that's

5  meant to secure the premises that was open?

6  A.   That's correct.

7  Q.   All right.  And the screen door that's entered in

8  photographs one and two or I guess 2A and B, the first two

9  photographs in the series, that was ajar.  Tell me what you

10  mean by ajar?

11  A.   It was open.

12  Q.   All right.  So what did you and the other officers do?

13  A.   Trooper Struzulo was at the door.  He knocked several

14  times, announced police, police, police.  After a period of

15  time there was no answer.  He moved into the apartment.

16  Eventually he made his way down to the back of the

17  apartment to the kitchen or dining room area.

18  Q.   Okay.  Fair to say it's not a big place?

19  A.   No, not real big.

20  Q.   Okay.  So you, you knocked, you announced police.  Did

21  you follow Trooper Struzulo and the other officers into the

22  apartment?

23  A.   Yes.

24  Q.   Okay.  And so when you get to, when you get inside the

25  apartment do you see anyone?

1  A.    Yes.

2  Q.    Who do you see?

3  A.    Later identified as Evelyn Bebe Diaz (ph) who emerged

4  from the rear room.

5  Q.    Okay.  And where did you encounter Evelyn Bebe Diaz?

6  A.    Well Trooper Struzulo did.

7  Q.    Okay.

8  A.    In the back dining room area.

9  Q.    Okay.  And did Mr., did Trooper Struzulo have a

10  conversation with her?

11  A.    Yes, he did.

12  Q.    Okay.  And did he tell her why you were all there?

13  A.    He asked her if she lived there and was anyone else

14  home.

15  Q.    Okay.  And what did she say when Trooper Struzulo

16  asked if she lived there?

17  A.    She said no and she said no to answer is anyone here--

18  Q.    Okay.

19  A.    --anyone else be home.

20  Q.    She said I don't live there and nobody else is home?

21  A.    Correct.

22  Q.    All right.  And you encountered her in sort of farther

23  in the apartment, correct?

24  A.    Yes.

25  Q.    All right.  And while Trooper Struzulo and you are,

1  and other officers are having a conversation with Evelyn

2  Bebe Diaz, do you hear something else in the apartment?

3  A.   Well when Trooper, yeah, excuse me.  When Trooper

4  Struzulo was having a conversation with Ms. Diaz he

5  observed a male and two pit bulls moving in that room that

6  she came out of.

7  Q.   Okay.  What did he do then?

8  A.   He immediately moved into the room and identified Mr.

9  Valle who was standing by the TV.

10  Q.   Okay.  And you recognize Mr. Valle in court today?

11  A.   Yes.

12  Q.   Could you point him out?

13  A.   He's wearing the jumpsuit.

14  Q.   Thank you.  Now do you go into the bedroom with

15  Trooper Struzulo?

16  A.   No.

17  Q.   Okay.  Where do you stay?

18  A.   I was in the dining room area at that point.

19  Q.   Okay.  But it's fair to say you learned that Orlando

20  Valle, the person you'd gone there to arrest, was found,

21  correct?

22  A.   Correct.

23  Q.   All right.  Where was Mr. Valle brought?

24  A.   He was brought out into the dining room area.

25  Q.   Okay.  Why, why, why was he brought out into the

1  dining room area?

2  A.   I assume to just get ready for transport and bring him

3  out of that room.

4  Q.   Okay.  Were the, were the pit bulls still in the

5  bedroom?

6  A.   Yeah, they were actually in the bedroom.

7  Q.   Okay. All right.  So how was Mr. Valle dressed at the

8  time that he was taken into custody?

9  A.   I don't recall actually what he had on.

10 Q.   Okay.  Did he have anything on his feet?

11 A.   Yes.

12 Q.   What?

13 A.   Flip flops.

14 Q.   Okay.  And did you, did Mr. Valle say anything about

15 what he was wearing to the officers who were present?

16 A.   Yes, he requested that he didn't want to go to court

17 in his flip flops so he wanted a pair of sneakers.

18 Q.   Okay.  And did he make any motions with his body or

19 his hands that told the officers who were present

20 essentially where they could go look for his sneakers?

21 A.   Well Trooper Struzulo asked him where his sneakers

22 were.  He said they were in his bedroom and he motioned

23 that with his shoulder towards the bedroom that he was

24 found in.

25 Q.   Okay.  So back in the same room where he'd been found

1  a moment ago?

2  A.   Correct.

3  Q.   All right.  Now when, so did Trooper Struzulo do

4  anything about finding Mr. Valle's shoes?

5  A.   Yes.

6  Q.   What did he do?

7  A.   He started into the room where Mr. Valle was.

8  Q.   And when he got into the room what happened?

9  A.   At that point Mr. Valle became agitated and began kind

10 of ranting and something to the effect of we're going to do

11 things my way and started pulling away from the officers

12 that were holding him.  And at that point we decided that

13 it would be best to bring him out front.

14 Q.   Okay.  Did you do that?

15 A.   Yes.

16 Q.   All right.  So you were not present when Trooper

17 Struzulo went back into the room, correct?

18 A.   No.

19 Q.   Okay.  You talk to Trooper Struzulo about him going

20 back into the bedroom?

21 A.   Yes.

22 Q.   All right.  And based on, you know, your conversation

23 with him and the reports that you reviewed what happened?

24 A.   When he went in to obtain the sneakers for Mr. Valle

25 he located a handgun.  It was in the heating register.

23

1  Q.   Okay.

2  A.   Next to the mattress.

3  Q.   All right.  So let me look at the next, why don't we

4  look at the next series of photographs.  This photograph

5  depicts essentially the bedroom where Mr. Valle was found;

6  is that correct?

7  A.   Yes.

8  Q.   Okay.  And there's a mattress, it looks like an air

9  mattress on the floor.  Does this picture essentially

10  fairly and accurately capture the way the room looked on

11  November 21, 2011?

12  A.   Yes.

13  Q.   All right.  And so based on your conversation with

14  Trooper Struzulo can you tell the Court essentially what he

15  did to find the shoes and how he found the gun?

16  A.   He just related to me and in his report that I read

17  that he went in the room to get the sneakers and when he

18  went to grab the sneakers he observed the gun--

19  Q.   Okay.

20  A.   --sitting in the register.

21  Q.   All right.  And, I don't know, register must be one of

22  those Massachusetts terms that doesn't get used everyplace

23  else.  I didn't know what a heating register was before

24  today's hearing so just in case anybody else - (inaudible -

25  #12:02:27).  The register is the heating panel on the

24

1  bottom of the floor; is that correct?

2  A.   Yes.

3  Q.   Okay.  And so--

4       THE COURT: What words do they use to describe

5  that object?

6       MR. POHL:  I don't know.  I just never heard.

7  Maybe it's just a gap in my education, I don't know.

8  BY MR. POHL:

9  Q.   When you're talking about the heating register we're

10 talking about this, the solid thing on the bottom of the

11 floor; is that correct?

12 A.   Yes.

13 Q.   All right.  Now there is a curtain that – (inaudible

14 #12:02:54); is that correct?

15 A.   That's correct

16 Q.   All right.  And I'm going to turn your attention to

17 the next photograph in the sequence.  And that's the

18 firearm that we're talking about?

19 A.   That's correct.

20 Q.   And was that firearm found in that location, I mean

21 does that photograph fairly describe where the gun was

22 found by Trooper Struzulo?

23 A.   Yes.

24 Q.   Okay.  And was the curtain down at the time when the

25 gun was found?

25

1  A.   Yes.

2  Q.   So this photograph is where the gun was but the

3  curtain has been pulled up; is that fair?

4  A.   That's correct.

5  Q.   Okay.  So when you and, well when Trooper Struzulo

6  found the gun did he tell you and the other officers that

7  he found it?

8  A.   Yes.

9  Q.   Okay.  And what, if anything, did you do once that gun

10  had been found?

11  A.   He notified Det. Brillon of the Lawrence police and

12  they decided to secure the house for a search warrant.

13  Q.   Okay.  And was a search warrant granted?

14  A.   Yes.

15  Q.   Was it executed later that morning?

16  A.   Yes.

17  Q.   All right.  And there's a copy of the search warrant

18  that's next to you.  Is that the search and the search

19  warrant return that was done in this case?

20      PAUSE

21  A.   Yes.

22          MR. POHL:  Okay.  And I'd ask that this be

23  introduced as Exhibit 3, Your Honor.

24          THE COURT:  Any objection?

25          MR. GROSSBERG:  No objection.

26

1          THE COURT:  All right.  Exhibit 3 in evidence.

2          GOVERNMENT EXHIBIT NO. 3, ADMITTED

3   BY MR. POHL:

4   Q.   All right, now when you went back and conducted a

5   search of the entire apartment you recovered the gun; is

6   that correct?

7   A.   That's correct.

8   Q.   All right.  And can you tell the Court essentially

9   once you had more time to look around, once the warrant was

10  executed, can you tell the Court just essentially what 282

11  Farnham Street looks like?  What kind of shape was the

12  building in when you got there?

13  A.   The building was in kind of tough shape.  There was a

14  heating element like I described with the register cut out

15  and the kitchen area was kind of a mess and was kind of in

16  disarray.

17  Q.   All right.  When you went to execute the search

18  warrant did you have to do anything to the building itself

19  to make it safe for the officers to execute the warrant?

20  A.   At one point one of the detectives from Lawrence

21  called to have the water shut off because I guess the pipes

22  according to the detective had been cut were running water

23  close to the electrical panel in the basement.

24  Q.   Okay.  So there was water flowing into the basement

25  from cut pipes; is that fair, all right.  When you executed

1    the search warrant in 282 Farnham Street did you find

2    other, aside from the gun, did you find any other items of

3    interest to you?

4    A.    Yes, during the search the detective found numerous

5    other items.

6    Q.    Okay.  Well let's look at some of the photographs that

7    are marked as Exhibit 2.  First of all did you find mail

8    and documents in the name of Orlando Valle at 282 Farnham

9    Street?

10   A.    Yes.

11   Q.    Okay.  And was one of these the next photograph in the

12   series is a letter that has Orlando Valle's name and Evelyn

13   Bebe Diaz's name; is that correct?

14   A.    That's correct.

15   Q.    And that was found pursuant to the search warrant?

16   A.    Yes.

17   Q.    All right.  There is what looks like a birth

18   certificate in the next photograph.  Was that found

19   pursuant to the search warrant?

20   A.    Yes.

21   Q.    And whose birth certificate is it?

22   A.    It's Orlando Valle's.

23   Q.    All right.  Were there any other gun or, well let me

24   ask you this question first, I don't know that it's in a

25   photograph, but were there any other guns or parts of guns

1  that were found pursuant to the search warrant?

2  A.   Yes.

3  Q.   What was found?

4  A.   A magazine to a .45 caliber handgun.

5  Q.   All right.  And what was the make and model of the gun

6  that was found in the heating register?

7  A.   It was a American Arms cx .22.

8  Q.   All right, so a different caliber?

9  A.   Yes.

10  Q.   Okay.  And in addition to the ammunition clip for a

11  different kind of gun did you find any ammunition in the

12  apartment?

13  A.   Yes.

14  Q.   All right.  And let me turn to the next photograph,

15  the next two photographs of the series.  Do you recognize

16  those items?

17  A.   Yes.

18  Q.   All right.  And what are they?

19  A.   That's ammunition the detective found in the closet

20  area.

21  Q.   All right.  Now in total between the ammunition that

22  was in the gun and the ammunition that was in the bag that

23  was just depicted in that, those photographs, how many

24  rounds of ammunition were pulled out of 282 Farnham Street?

25  A.   Eighty-four.

29

1   Q.   Okay.  Did you find anything else in the search

2   warrant?  Did you find, let me put it this way, did you

3   find any other documents in the search warrant?

4   A.   Yes.  The detectives found a document of the Immortal

5   Outlaws gang located in the closet area--

6          THE COURT:  What gang?

7          THE WITNESS:  The Immortal Outlaws.

8          THE COURT:  The Immortal Outlaws.

9          THE WITNESS:  Correct.

10  BY MR. POHL:

11  Q.   Have you in the course of your duties as an ATF agent

12  heard of the gang the Immortal Outlaws at least as the

13  part, the chapter of that gang that operates in Lawrence?

14  A.   Yes.

15  Q.   Okay.  Have you also before your testimony here today

16  spoken with other Lawrence police officers concerning their

17  knowledge of the gang?

18  A.   Yes.

19  Q.   All right.  And based on those conversations and your

20  own experience what can you tell the Court about the

21  Immortal Outlaws as they operate in the city of Lawrence?

22  A.   Speaking with the Lawrence detectives they basically

23  told me that the Immortal Outlaws is a known violent gang

24  and that Mr. Valle has been an outlaw for quite a while.

25  Q.   Okay. And so during the course of the execution of the

1   search warrant you found something that was connected to

2   the gang; is that correct?

3   A.   Yes.

4   Q.   All right.  And what was it exactly?

5   A.   It was the Constitution.

6   Q.   There's a document--

7        THE COURT:  Constitution of the gang or of the

8   United States?

9        THE WITNESS:  Of the gang, Your Honor.

10  BY MR. POHL:

11  Q.   All right.  That document that's in front of you,

12  Special Agent Mar, do you recognize it?

13  A.   Yes.

14  Q.   All right, and what is it?

15  A.   That is the Constitution bylaw for the outlaw, the

16  Immortals.

17  Q.   Okay.  And that was found inside of Orlando Valle's,

18  inside of 282 Farnham Street?

19  A.   That's correct.

20        MR. POHL:  All right.  I'd ask that this be

21  introduced as Government's 4, Your Honor.

22        THE COURT:  All right, any objection?

23        MR. GROSSBERG:  Yes, Your Honor.

24        THE COURT:  What's the objection?

25        MR. GROSSBERG:  It's irrelevant at this point.

1    What's the connection to Mr. Valle.  It's one item in the

2    apartment.

3            THE COURT:  No, I'll take it.  It's an item found

4    in the apartment in which there's some evidence that he was

5    living in.  It's found there and his birth certificate and

6    mail was addressed to him there.  So I'll overrule that

7    objection.

8            MR. POHL:  All right.

9            THE COURT:  Document 4 in evidence.

10           GOVERNMENT EXHIBIT NO. 4, ADMITTED

11   BY MR. POHL:

12   Q.   Were there any phones found in the apartment pursuant

13   to the search warrant?

14   A.   Yes.

15   Q.   All right.  How many phones?

16   A.   I think three.

17   Q.   Okay.  Now you reviewed the search warrant and the

18   search warrant return; is that correct?

19   A.   Yeah.

20   Q.   Okay.  How many phones are listed on the search

21   warrant return?  Do you want to double check?

22   A.   Yes.

23   Q.   Okay.

24        PAUSE

25   A    Two.

32

BY MR. POHL:

Q.   Okay.  Now have you spoken to the Lawrence police

officers who helped execute the search warrant?

A.   Yes.

Q.   All right.  Did you talk to them about how many

evidence submission sheets there are on the phones that

were seized from 282 Farnham Street?

A.   Yes.

Q.   All right.  And it's fair to say there were three that

were submitted in evidence?

A.   That's correct.

Q.   All right.  So they missed one of the phones in the

search warrant return, correct?

A.   They did.

Q.   All right.

Q.   Did you or the other Lawrence detectives you were

working with, did they do anything with respect to the

phones that were searched or that were seized on November

21, 2011?

A.   Yes, they applied for search warrants to locate the

phones.

Q.   Okay.  And did they find anything of interest to them

when they searched the phones?

A.   Yes.

Q.   All right.  And specifically which phone, well did

33

1  they find any photographs on the phones?

2  A.   Yes.

3  Q.   All right.  Which phone did they find photographs on?

4  A.   The HTC phone.

5  Q.   Okay.  And that's the phone that's not listed on the

6  search warrant return; is that correct?

7  A.   That's correct.

8  Q.   Okay.  But there were several photographs contained on

9  the phone?

10  A.   That's correct.

11  Q.   All right.  The last photograph is to your right,

12  Special Agent Mar.  Do you recognize that?

13  A.   Yes.

14  Q.   And what is it?

15  A.   It's a photograph of Orlando Valle.

16  Q.   All right.  And what does Orlando have in that

17  photograph?

18  A.   He's holding two guns in his hand and there's one in

19  his waistband.

20  Q.   Okay.  Now there's two guns in the hand, correct?

21  A.   Yeah.

22  Q.   And there's one in the waistband, correct?

23  A.   Correct.

24  Q.   So you can't really see the full image of any of the

25  guns that are in that picture, correct?

34

1  A.   Well you can see them fairly well.

2  Q.   Okay.  That's why you're the expert and I'm not.  Is

3  there any of the guns that are in that picture that look

4  like the gun that was recovered from the heating register

5  in 282 Farnham Street?

6  A.   Yes.

7  Q.   All right, which one of the three guns that are in

8  that picture looks like the gun that was found at 282

9  Farnham Street?

10  A.   The one tucked in his waistband.

11  Q.   All right, thank you.

12        MR. POHL:  Now Your Honor, I'd ask that that

13  photograph be admitted as Exhibit 5.

14        THE COURT:  Any objection?

15        MR. GROSSBERG:  No, Your Honor.

16        THE COURT:  Exhibit 5 in evidence.

17     GOVERNMENT EXHIBIT NO. 5, ADMITTED

18        MR. POHL:  Thank you very much.

19        THE COURT:  All right.  Cross examination Mr.

20  Grossberg?

21        MR. GROSSBERG:  May I proceed, Your Honor?

22        THE COURT:  Yes, go ahead.

23                    CROSS EXAMINATION

24  BY MR. GROSSBERG:

25  Q.   Sir, in regard to the incident or incidents of 2007

35

1  where Mr. Valle's name became known to you, you indicated

2  that there was a straw buyer going from Massachusetts to

3  New Hampshire, purchasing guns and then selling those

4  firearms in the Commonwealth?

5  A.   That's correct.

6  Q.   And one of the persons to whom he sold guns was Mr.

7  Valle?

8  A.   That's correct.

9  Q.   At any time were either of the guns purchased in New

10 Hampshire were they recovered in any way?

11 A.   Yes.

12 Q.   And were they recovered, you said there were 15

13 firearms sold to Mr. Valle.  Were either of those firearms

14 recovered?

15 A.   Not that I'm aware.

16 Q.   And the guns that you say were recovered they were

17 from other straw purchases that this cooperating individual

18 made?

19 A.   The ones I know of, yes.

20 Q.   And how many firearms did this other person purchase

21 in the state of New Hampshire and bring back for sale in

22 the Commonwealth?

23 A.   I don't know the exact number?

24 Q.   What's your best estimate as to the number of

25 firearms?

1  A.   I'd say over 20.

2  Q.   Over 20?

3  A.   Yeah.

4  Q.   And was this cooperating individual prosecuted

5  federally either in the Commonwealth of Massachusetts or

6  New Hampshire?

7  A.   Yes.

8  Q.   And did he receive a sentence?

9  A.   Yes.

10  Q.   And is there any other evidence that you are aware of

11  to support this person's contention that he sold 15

12  firearms to Mr. Valle other than his verbal statements to

13  you?

14  A.   The statements weren't to me.

15  Q.   Well to whoever, to whomever the statements were other

16  than the verbal statements of this cooperating individual,

17  did you or your agency obtain any other support for his

18  statements that he sold firearms to Mr. Valle?

19  A.   Not that I'm aware.

20  Q.   So the only thing you can rely upon and relating to

21  this Court is his verbal statements; is that correct?

22  A.   That's correct.

23  Q.   And in addition, neither of the 15 firearms that this

24  cooperating individual purchased in New Hampshire which he

25  claimed he sold to Mr. Valle have ever been recovered?

1   A.   Not to my knowledge.

2   Q.   And Mr. Valle was not charged in any way in regard to

3   those particular incidents?

4   A.   Are you speaking of the sale of the firearms?

5   Q.   The purchase of the firearms from the cooperating

6   individual?

7   A.   No.

8   Q.   And the efforts that you endeavored to make through

9   the cooperating individual for him to repurchase the

10  firearms from Mr. Valle were not successful?

11  A.   Correct.

12  Q.   So in regard to this alleged incident in 2007 the only

13  thing that you have or that you can relate is that this

14  individual who was prosecuted told you that he sold

15  firearms to Mr. Valle?

16  A.   That's correct.

17  Q.   With no other supporting or corroborating evidence?

18  A.   That's correct.

19  Q.   Now in regard to the incident in which Mr. Valle was

20  charged with assault and battery in November of 2011,

21  you're aware of the fact that he was prosecuted for that

22  offense or charges were brought for that offense in the

23  Lawrence District court; is that correct?

24  A.   I know the warrant was obtained there.

25  Q.   Right.  But are you aware of the fact that those

1  charges were dismissed against Mr. Valle on March 8th of

2  2012?

3  A.   Yes, I believe I do, only didn't say that.

4  Q.   And you said that that, those charges involve the sale

5  of an automobile between the alleged victim and Mr. Valle;

6  is that correct?

7  A.   That's correct.

8  Q.   And what had occurred was that Mr. Valle had sold an

9  automobile to the alleged victim?

10  A.   That's not how I understood it.

11  Q.   What was your understanding?

12  A.   I understood it as she had sold the car.

13  Q.   So you don't know if he sold the car or if she sold

14  the car?  You don't know which?

15  A.   My understanding is that she sold the car to him.

16       MR. GROSSBERG:  May I have a moment, please?

17       THE COURT:  You may.

18       PAUSE

19  BY MR. GROSSBERG:

20  Q.   All right, at any rate the dispute about the

21  automobile, forgetting about who sold the car to who, was

22  that there were some belongings in the car that she wanted

23  back?

24  A.   Correct.

25  Q.   And eventually that matter was resolved, the

1  belongings?

2  A.   That I'm not aware.

3  Q.   At any rate the assault charge was the basis for the

4  arrest warrant that was issued for Mr. Valle; is that

5  correct?

6  A.   That's correct, assault and assault with a dangerous

7  weapon.

8  Q.   And at some point the Lawrence police officers

9  ascertained that Mr. Valle lived on or could be located at

10 Farnham Street; is that correct?

11 A.   That's correct.

12 Q.   And you were part of the team that went to that

13 location to execute the arrest warrant; is that correct?

14 A.   That's correct.

15 Q.   And Mr. Valle was in fact where he was expected to be?

16 A.   Correct.

17 Q.   And when you had, you said you had an opportunity at

18 some point to make observations of Farnham Street; is that

19 correct?

20 A.   Yes.

21 Q.   And the apartment that you described how many rooms

22 was it?

23 A.   There was a front room, a middle room, bedroom, dining

24 room, galley kitchen and a rear bedroom.

25 Q.   And at some point you said that the premises looked as

1    if the premises were in pretty bad shape?

2    A.   That's correct.

3    Q.   And did you ascertain at some point that in fact there

4    had been a foreclosure of that property?

5    A.   Yes, Det. McMillen I believe found that out.

6    Q.   And did you ascertain that basically that the

7    apartment had been abandoned?

8    A.   Well it wasn't abandoned because there was beds in

9    there.

10   Q.   Well was any, did you discover at any point or any

11   reports that you consulted that anyone had rented that

12   apartment, had been leased to anyone?  Was there any lawful

13   tenancy in regard to that apartment?

14   A.   According to Glenna Gazares (ph) who was a tenant of

15   that 282 Farnham Street that her and Mr. Valle were living

16   there.

17   Q.   Well she was live--

18   A.   He had one room and she had the other.

19   Q.   All right so there was another occupant of that

20   apartment?

21   A.   That's correct.

22   Q.   And did you ascertain or did any reports that you

23   consulted indicate to you that there were other persons who

24   were occupying that apartment?

25   A.   There were other names found in the apartment.

41

1  Q.   Well, it's fair to say there were belongings found

2  that, in addition to the papers that you described with Mr.

3  Valle's name on it there were papers found in the apartment

4  with a number of other, identifying a number of other

5  people; is that correct?

6  A.   Yeah, I can say that there were other people's names

7  on documents.

8  Q.   How many other people would you say?

9  A.   I don't know.

10 Q.   And was it fair to say, sir, that based upon your

11 experience and training and your observations of that

12 apartment that it appeared to be a crash pad?

13 A.   Could you – a crash pad?

14 Q.   Well a pad where people would come and stay on a

15 roaming type of basis?

16 A.   Well there were other people's belongings in there but

17 there was also, you know, Mr. Valle's belongings there.

18 Q.   Well in regard to Mr. Valle's belongings when you went

19 back to execute the search warrant did you, is it fair to

20 say, seize items that you thought would be of evidentiary

21 value?

22 A.   Yes.

23 Q.   Did you seize any piece of article of clothing which

24 you can attribute to Mr. Valle?

25 A.   Not that I'm aware of.

42

1  Q.   Do you know if there were any men's clothing that

2  might fit Mr. Valle in that apartment?

3  A.   I can't say for certain.

4  Q.   Did you notice any type of medication other than the

5  few items that you mentioned, medication, any other items

6  of a personal nature that belonged to Mr. Valle or somehow

7  is identified to him that you took from that apartment?

8  A.   Well other than the birth certificate and the lic, I

9  mean his ID and things of that nature, no.

10 Q.   All right, and was the birth certificate in Mr.

11 Valle's wallet?

12 A.   I don't know that.

13 Q.   Was Mr. Valle's wallet taken?

14 A.   I don't know that either.

15 Q.   And in regard to - strike that.

16     Did you discover whether or not any utilities were

17 listed to Mr. Valle in regard to the apartment?

18 A   I believe there was a phone book wrapped in the plastic

19 wrap with his name and address 282 Farnham that was found

20 in that closet area.  I believe there was also a phone,

21 either a phone bill or a phone flier with his name and

22 address.

23 Q.   But other than that no utilities that you can recall

24 being listed in his name?

25 A.   Not that I can recall.

43

1  Q.   And in regard to the items that were seized, in

2  particular the firearm, the subject of this prosecution,

3  was that – who actually seized that firearm?

4  A.   The Lawrence police department.

5  Q.   And do you know, sir, to your knowledge was it seized

6  in such a manner to preserve it being subjected to

7  fingerprint testing?

8  A.   Yes, as far as I know.

9  Q.   And do you know the results of that – and was it

10  subjected to fingerprint testing?

11  A.   Yes, it was.

12  Q.   And what was the results of the fingerprint testing?

13  A.   I believe the report said it's not, non-significant

14  ridge detail.

15  Q.   So fair to say that there's no evidence throughout

16  this investigation which indicates that the firearm

17  contained Mr. Valle's fingerprints?

18  A.   That's correct.

19  Q.   And in addition to the firearm you said that there

20  were a total of 84 rounds of ammunition seized?

21  A.   That's correct.

22  Q.   And that includes ammunition that was inside the

23  firearm?

24  A.   Yes.

25  Q.   And a bag of ammunition that was seized?

44

1  A.   Yes, there was more than one bag.  There was two

2  bags.

3  Q.   And of the 84 rounds of ammunition do you have any

4  indication or did you obtain any evidence that Mr. Valle's

5  fingerprint was on either of the 84 rounds?

6  A.   I believe a sample of the round was sent to the lab

7  and there was no, I think they weren't able to get the

8  significant ridge detail.

9  Q.   And in terms of the firearm involved in this case what

10  type of firearm again was it?

11  A.   It was a .22 caliber pistol.

12  Q.   How would that be loaded?  What's the method that one

13  would use to load that firearm?  How would the cartridges

14  actually be placed in the firearm?

15  A.   Well there in a magazine that goes up in the well.

16  Q.   All right.  And to put the cartridges into the

17  magazine is it fair to say that one would have to touch the

18  cartridges in order to place them in the magazine?

19  A.   Yes.

20  Q.   And there's no fingerprints on the cartridges and

21  there's no fingerprints on the magazine that you can

22  indicate belong to Mr. Valle?

23  A.   That's correct.

24  Q.   And, sir, do you know whether or not the firearm was

25  subjected to any type of DNA analysis?

45

1   A.   Yes, DNA swabs were taken.

2   Q.   And what was the results of that?

3   A.   There hasn't been any results yet.  We'd have to

4   submit a request form to get that.

5   Q.   And so where was the rounds of ammunition found other

6   than the ones that were in the firearm?

7   A.   The detectives located them in the closet area.

8   Q.   And the magazine for the .45 caliber where was that

9   located, if you recall?

10  A.   I don't.

11  Q.   And do you know, sir, whether or not any portion of

12  this residence was ever subjected to any type of

13  fingerprint analysis to determine if Mr. Valle's

14  fingerprints were anywhere on the interior of the

15  apartment?

16  A.   No.

17  Q.   It was not done?

18  A.   It was not done to my knowledge.

19  Q.   Now--

20          MR. GROSSBERG:  If I may, Your Honor?

21          THE COURT:  Show one of the exhibits?

22          MR. GROSSBERG:  I just wanted to see that last

23  photograph.

24      PAUSE

25  BY MR. GROSSBERG:

1   Q.   Sir, I'm going to show you what's been marked as

2   Exhibit 5.  Do you, sir, know from the investigation

3   conducted by you or your agency or any other police, law

4   enforcement agency whether or not it was determined when

5   that photograph was taken?

6   A.   I personally don't.

7   Q.   Do you know if any type of investigation was done to

8   determine when that photograph was taken?

9   A.   I don't.

10  Q.   All right.  And this was the photograph you indicated

11  that was downloaded from one of the phones that you found

12  in the apartment and the particular phone did not appear on

13  the search warrant; is that correct?

14  A.   That's correct.

15  Q.   Now based upon your experience and training can you

16  say whether or not either of the firearms that Mr. Valle is

17  depicted as holding in Exhibit 5 is actual firearm?

18  A.   No.

19  Q.   So it could be a toy firearm?

20  A.   It could be.  I don't see a lot of gang members with

21  toy firearms.

22  Q.   Well before we get to that in terms of the objects

23  that Mr. Valle is holding in his hand in this photograph,

24  fair to say that based upon your experience and training

25  you cannot say whether or not either of the firearms is an

1 actual firearm or a toy firearm?

2 A.   No, I cannot.

3 Q.   Thank you.  Now in terms of Mr. Valle's connection

4 with the outlaws, Immortal or Immortal Outlaws, didn't you

5 make any inquiry of the local police as to whether or not

6 Mr. Valle was known as a member of that particular gang?

7 A.   Yes.

8 Q.   And what was the results of that?

9 A.   They said he was.

10 Q.   Who said he was?

11 A.   The detective in the gang unit, I'm just trying to

12 think of his name, - (inaudible - #12:31:23).

13 Q.   Does the name Det. Paul McMillen ring or refresh your

14 memory in any way?

15 A.   Yeah, yeah.

16 Q.   Was that the person who gave you that information?

17 A.   Well I recently spoke with - (inaudible - #12:31:40).

18 Q.   And you indicated that you have reviewed the police

19 reports of the Lawrence police department in regard to the,

20 their involvement in the search of the residence; is that

21 correct?

22 A.   That's correct.

23 Q.   And are you aware of the fact that your report of a

24 Detective Paul McMillen dated November 22, 2011 talks about

25 the constitution for the Immortal Outlaws?

1   A.   Yes.

2   Q.   And do you recall that in his report he stated in the

3   eat-in kitchen section where the table and refrigerator are

4   located the following items were seized, mail address to

5   Juan Lassis (ph), police scanner found on top of the

6   refrigerator.  Juan Lassis is a known associate of Orlando

7   Valle and is currently held at the Middleton jail for a

8   home invasion.  Also located in the envelope with Juan

9   Lassis' name on it was a copy of the constitution for the

10  Immortal Outlaws.  Lassis is also known to police as an

11  Immortal Outlaw gang member.  And that's what the detective

12  who was involved in the search indicated in his report, did

13  he not?

14  A.   Yes.

15  Q.   And there's nothing in there about Mr. Valle being a

16  member of the Immortal Outlaws?

17  A.   In that report?

18  Q.   Yes.

19  A.   No.

20  Q.   And matter of fact the constitution of the Immortal

21  Outlaws was found in an envelope not with Mr. Valle's name

22  but with the name Juan Lassis; is that correct?

23  A.   I believe there were two constitutions.

24  Q.   Two constitutions?  All right, so one is found on the

25  refrigerator in an envelope with Juan Lassis' name and

49

1    where's the other constitution?

2    A.    I believe the other one was found in the closet.

3    Q.    Are you certain of that?

4    A.    I'm not certain of it.

5    Q.    Now you indicated that when one of the troopers went

6    into the, or one of the officers went into the bedroom to

7    retrieve Mr. Valle's sneakers he observed the firearm; is

8    that correct?

9    A.    That's correct.

10   Q.    And he observed in the register or the heating

11   register next to the bed; is that correct?

12   A.    That's correct.

13   Q.    And did he search to your knowledge for the firearm?

14   A.    Not to my knowledge.

15   Q.    And he simply went into the bedroom to obtain Mr.

16   Valle's sneakers; is that correct?

17   A.    That's correct.

18   Q.    And in one of the photographs, I believe in Exhibit 2,

19   is the photo of the bedroom; is that correct?

20   A.    Yes.

21   Q.    And in the photo of bedroom the register where the

22   firearm was found is covered by some form of drapery; is

23   that correct?

24   A.    Yeah.

25   Q.    And in addition the bed was pushed against the

1  register and the drapery, was it not?

2  A.   Yes.

3  Q.   So is it fair to say, sir, that the drape over the

4  window was covering the place in the register where the

5  firearm was found and in addition the bed was pushed

6  against the register?

7  A.   I can't tell you what Trooper Struzulo saw when he

8  went in there.

9  Q.   But in terms of this photograph in Exhibit 2 this

10  fairly and accurately depicts the curtains, the drapes over

11  the register and the bed against the register?

12  A.   It is but at this angle, but he was over here getting

13  the sneakers and that's a different view and that blind was

14  pretty transparent.

15  Q.   All right, but you don't know in relation to

16  photograph, this photograph from Exhibit No. 2 where in

17  particular the firearm was found in relation to the bed,

18  the air mattress and the curtain?

19  A.   It was underneath the window in the register.

20  Q.   And you don't know if the curtain was concealing that

21  firearm?

22  A.   I don't know if it was moved or.

23  Q.   All right, one last question.  Mr. Valle was the

24  person who requested you to go into the bedroom to retrieve

25  his sneakers; is that correct?

1  A.    It was not me.

2  Q.    Whoever, he made the request to?

3  A.    Yeah.

4  Q.    He asked that the trooper go into the bedroom and get

5  his sneakers; is that correct?

6  A.    He did.

7           MR. GROSSBERG:   Thank you.

8                    REDIRECT EXAMINATION

9  BY MR. POHL:

10  Q.    And then after he asked for the sneakers what

11  happened?  What did Mr. Valle do after he – (inaudible –

12  #12:37:14).

13  A.    He became visibly agitated and he started pulling

14  away.

15  Q.    And that's when you took him outside?

16  A.    That's correct.

17           MR. POHL:  All right.  Thank you.  Nothing

18  further.

19           THE COURT:  Any other questions Mr. Grossberg?

20           MR. GROSSBERG:  No, Your Honor.

21           THE COURT:  All right, Special Agent Mar, you're

22  excused.  Thank you very much.

23      WITNESS EXCUSED

24

25

52

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                          CERTIFICATION

21      I, Maryann V. Young, court approved transcriber,

22  certify that the foregoing is a correct transcript from the

23  official digital sound recording of the proceedings in the

24  above-entitled matter.

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

53

1    /s/ Maryann V. Young                    January 9, 2013

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19